# IN THE SUPERIOR COURT OF THE VIRGIN ISLANDS
## District of St. Thomas/St. John

GOVERNMENT OF THE VIRGIN ISLANDS,
**Plaintiff**

v.

VIRGIN ISLANDS WATER AND POWER
AUTHORITY

      **Defendant.**

Case Number: ST-2021-CV-00361
Action: **Declaratory Relief**

## NOTICE of ENTRY
## of
## MEMORANDUM OPINION AND ORDER

To: Julie A. Beberman, Esq.
Ariel M. Smith, Esq.

Dionne Gaile Sinclair, Esq.
Aysha R. Gregory, Esq.

Please take notice that on March 09, 2023

a(n) _____ Memorandum Opinion and Order _____

    dated _____ March 8, 2023 _____ was/were entered

by the Clerk in the above-titled matter.

Dated: __March 09, 2023__

                          **Tamara Charles**
                          **Clerk of the Court**

By: _____

                          **Donna D. Donovan**
                          **Court Clerk Supervisor**

# IN THE SUPERIOR COURT OF THE VIRGIN ISLANDS

## DIVISION OF ST. THOMAS AND ST. JOHN

**\*\*\*\*\*\*\*\*\*\***

GOVERNOR ALBERT BRYAN, JR.,　　　　　)
in his official capacity, and the　　　　　　)　　　CASE NO. ST-21-CV-361
GOVERNMENT OF THE VIRGIN ISLANDS　)
　　　　　　　　　　　Plaintiffs,　　　)　　　ACTION FOR DECLARATORY
　　　　　　　　v.　　　　　　　　　)　　　JUDGMENT AND INJUNCTIVE
　　　　　　　　　　　　　　　　　　)　　　RELIEF
VIRGIN ISLANDS WATER AND POWER　　　)
AUTHORITY,　　　　　　　　　　　　)　　　Cite as 2023 V.I. Super 5
　　　　　　　　　Defendant.　　　　　)
　　　　　　　　　　　　　　　　　　)

**ARIEL M. SMITH, Esq.**
**JULIE A. BEBERMAN, Esq.**
Assistant Attorneys General
V.I. Department of Justice
34-38 Kronprindsens Gade
GERS Building, Second Floor
St. Thomas, Virgin Islands 00802
*Attorneys for Plaintiffs*

**DIONNE G. SINCLAIR, Esq.**
**AYSHA R. GREGORY, Esq.**
V.I. Water & Power Authority
P.O. Box 1450
St. Thomas, Virgin Islands 00804
*Attorneys for Defendant*

**CARTY, RENÉE GUMBS,** Judge

## MEMORANDUM OPINION

¶1　　**BEFORE THE COURT** is Plaintiffs Governor Albert Bryan, Jr., and the Government of the Virgin Islands' ("Plaintiffs") "Motion for Temporary Restraining Order, Preliminary Injunction, and Declaratory Judgment" filed on August 27, 2021, seeking injunctive relief against the implementation of Act No. 8472. On September 20, 2021, Plaintiffs and the Defendant Virgin Islands Water and Power Authority ("WAPA" or the "Authority") stipulated to a temporary

restraining order which restored the Defendant's Governing Board (the "Board") to its composition prior to the enactment of Act No. 8472.

¶2     On May 4, 2021, the Virgin Islands Legislature passed Bill No. 34-0026, which was subsequently vetoed on May 19, 2021. On August 6, 2021, the Legislature informed the Governor that it had voted to override the veto and enacted the law as Act No. 8472. The Act reads as follows:

> "An Act amending title 30 Virgin Islands Code, chapter 5, subchapter II, section 104 relating to the Virgin Islands Water and Power Authority to establish minimum criteria for the Virgin Islands Water and Power Authority Governing Board and changing the number of its members; and amending section 104(b) to change the number of members of the Governing Board constituting a quorum from five to four.

> ***Be it enacted by the Legislature of the Virgin Islands:***

> **SECTION 1.** Title 30 Virgin Islands Code, chapter 5, subchapter II, section 103 is amended as follows:

(a) Subsection (a) is amended;

> (1) In the first sentence by striking "nine persons, six of whom shall not be employees of the Government of the Virgin Islands or the Government of the United States and inserting "the Director of the Virgin Islands Energy Office and six non-governmental members" and by striking "and three of whom shall be appointed by the Governor from among the heads of cabinet-level executive departments or agencies"; and
> (2) In the second sentence by inserting after "St. John," the phrase "of whom at least one must reside on St. John"; and after "St. Croix" by adding a sentence that reads"
> "No more than two of the non-governmental board members, may reside outside of the territory".
> (3) In the sixth sentence by:
>> (A) Inserting "the" before the word "government"; and
>> (B) Striking "members" and inserting "member".
> (4) In the seventh sentence by"
>> (A) Striking "No" and inserting "The" in its place; and
>> (B) Inserting the word "not" between the words "shall" and "be"; and
> (5) In the eighth sentence by striking "50.00" and inserting "$175" in its place.

(b) Subsection (c) is added to read as follows:

"(c) Non-governmental members of the Governing board must have formal education or experience in at least one of the following:

(1) Engineering, power generation;
(2) Energy, natural resources conservation, environmental science, planning;
(3) Economics, accounting, finance;
(4) Public affairs;
(5) Law; or
(6) Computer Technology Information Systems."

(d) No member of the Board may enter into an employment relationship, consulting, or representation agreement or other similar contractual agreement with any entity contracted or subcontracted by the Authority for a period of one year after the member ceases to serve as a member on the Board.

¶3 On October 5, 2021, the Court held a preliminary and permanent injunction hearing. At this hearing both parties agreed that there should be a permanent injunction on the enforcement of Act No. 8472. Notably, this matter presents a unique situation where the parties are not adversarial, and both question the validity of the Act and desire the same outcome. Additionally, the Plaintiffs requested declaratory judgment stating Act No. 8472 is in violation of the Revised Organic Act of 1954 § 11. For the following reasons, the Court will deny Plaintiffs' motion.

## BRIEF HISTORY OF WAPA

¶4 In 1964, the 5th Legislature of the Virgin Islands created WAPA as a public corporation and autonomous governmental instrumentality for the purpose of developing and providing water and electric power services for the people of the Virgin Islands. 30 V.I.C. § 103(b); *see also V.I. Public Services Comm'n v. V.I. Water & Power Auth.*, 49 V.I. 478, 480 (V.I. 2008). From its inception, WAPA, as a corporation, was established as having a "legal existence and personality separate and apart from the Government." *See Cyprian v. Butcher, et al.*, 53 V.I. 224, 227 (V.I. Super. Ct. 2010).

3

¶5    Since the late 1990s, there have been two attempts to privatize WAPA, both with a sale to Southern Energy, Inc. ("Southern"). *See Chiang v. Turnbull*, 43 V.I. 49, 53 (V.I. Terr. Ct. 2000). Beginning with the Honorable Governor Roy L. Schneider's administration and then again in the late Honorable Governor Charles W. Turnbull's administration, the Executive branch attempted to partner with Southern to "sell or transfer an interest in WAPA ... in exchange for cash or other consideration." *Id.* at 55. Then-Governor Turnbull signed the agreement on April 14, 2000. *See Id.* at 57. The deal was defeated in the 23rd Legislature later that year.

¶6    Since then, WAPA has continued to operate under its status as a public corporation and autonomous governmental instrumentality. Title 30 V.I.C. § 105 provides for the powers granted to the Authority, as designated by the Legislature, providing for WAPA to "exercise all rights and power necessary or desirable for carrying out said purposes." Section 105 has twenty-four (24) clauses defining the powers of the Authority and establishing its "perpetual existence as a corporation,"[1] and providing for WAPA's express authority to: "sue and be sued in its corporate name,"[2] "make contracts and to execute all instruments necessary or convenient,"[3] and to "have complete control and supervision of facilities and properties constructed or acquired by it."[4]

¶7    In 1980, the 13th Legislature unilaterally amended WAPA's charter to "expand[] WAPA's enumerated powers," *See Cyprian v. Butcher*, at 229. For example, Act No. 6486 provided for WAPA to "install and maintain adequate street lights in the urban and rural residential sections,"[5] and "maintain and control the Water Purification Barge."[6] Other, similar, changes to Section 105

---

[1] Title 30 V.I.C. § 105(1).
[2] *Id.* at § 105(4).
[3] *Id.* at § 105(5).
[4] *Id.* at § 105(13).
[5] Title 30 V.I.C. § 105(19).
[6] *Id.* at § 105(2).

occurred in 2001,[7] 2002,[8] 2005,[9] and 2013.[10] All of the amendments to Section 105 expanded the Authority's powers as the Legislature saw necessary for WAPA to carry out its purpose of "aiding in the development and utilization of adequate water and electric power systems for the people of the Virgin Islands."

¶8    Similarly, by amending Title 30 V.I.C. § 103, the Legislature has reorganized WAPA's Governing Board several times throughout its history. At WAPA's inception in 1964, the Board consisted of the Governor, the Commissioner of Public Works, and the members of the Authority.[11] *See* Act No. 1248 (1964), codified at Title 30 V.I.C. § 103(a). Then, in 1968, the 7th Legislature amended § 103(a) and the Board consisted of the Governor, the Commissioner of Public Works, the Commissioner of Commerce, the Director of Budget, and five other persons to be appointed by the Governor. *See* Act No. 2366 (1968). A decade later, in 1978, the 12th Legislature amended § 103(a) again and established the structure of the Board to consist of six non-governmental members, removable only for cause, and three cabinet-level members. *See* Act No. 4108 (1978). Thus, the structure has remained the same for the last 45 years and the parties, as previously stated, have stipulated to preserve the status quo.

¶9    Notwithstanding those changes of the Board in the past, in recent years, the Legislature has unsuccessfully attempted to reorganize WAPA several times. For example, in 2018, Senator

---

[7] *See* Title 30 V.I.C. § 105 (12) providing that WAPA shall "install electrical poles and power lines at no cost to its customers."

[8] *See Id.* at § 105(12) to add the language "and maintain and install street lights" to subsection 12.

[9] *See Id.* at § 105(12) prohibiting WAPA from being able to charge "a reconnection fee or any administrative or service fee associated with the reconnection of electrical and water services in excess of $25 for services disconnected for untimely non-payment."

[10] *See Id.* at § 105(24) providing WAPA "to do all acts or things necessary to carry out the applicable provisions of The Virgin Islands Ratepayers' Bill of Rights in section 1a of this title."

[11] In 1964, the only members of the Authority were the Governor, the Commissioner of Public Works, and two non-governmental members, one a resident of St. Thomas and one a resident of St. Croix. *See* Act No. 1248 § 103(a).

Neville A. James of the 32nd Legislature proposed a bill to reconstruct the Board which did not make it to the Senate floor.[12] *See* BR Number 18-0903 (2018). The 33rd Legislature attempted to pass a bill similar to Act No. 8472, which established criteria for non-governmental members and changed the structure to consist of eight members: seven non-governmental members and either the Director of Energy, the Commissioner of the Department of Planning and Natural Resources, or the Commissioner of Public Works. That bill was vetoed by Governor Bryan on October 26, 2020. *See* Bill No. 33-0210 (2020). On that same day, the Governor vetoed a different bill which would have established a management and oversight review committee to oversee the decisions taken by WAPA's Board. *See* Bill No. 33-0346 (2020). The 34th Legislature attempted to revamp that bill; however, to date, it has not been passed. *See* Bill No. 34-0022 (2021). The Legislature's only successful attempt at reorganizing WAPA's Board since 1978 passed on August 3, 2021, when the Legislature overrode the Governor's veto and enacted Act No. 8472.

## BRIEF HISTORY OF EXECUTIVE AND LEGISLATIVE POWERS UNDER THE ROA

¶10    The Virgin Islands Revised Organic Act of 1954 ("ROA") "functions as the Congressionally enacted constitution of the Virgin Islands." *Government of the Virgin Islands v. Harmon*, 289 F.Supp.2d 685, 686 (D.V.I. 2003). The ROA delegated certain powers to the Government of the Virgin Islands and "also established a system of separation of powers within its branches, with executive functions vested in the Executive Branch, legislative functions vested in the Legislative Branch, and judicial functions vested in the Judicial Branch." *Balboni v. Ranger American of the V.I., Inc.*, 70 V.I. 1048, 1084 (V.I. 2019).

---

[12] The Court's extensive research did not yield the specific language within the proposed bill nor the proposed structural changes.

¶11     Prior to the United States' purchase of the Virgin Islands from Denmark in 1917, the territory was organized under a constitutional monarchy and had separate legislative, executive, and judicial branches. *See Ballentine v. U.S.*, 2001 WL 1242571 *1-4 (D.V.I. 2001). On June 22, 1936 the first Organic Act of the Virgin Islands was passed by the United States Congress.[13] It continued the Danish-organized limited self-government structure, in which there was a governor appointed by the President of the United States (previously the King of Denmark) and was comprised of two Colonial Councils, one representing the district of St. Croix and one representing the district of St. Thomas-St. John. *Id.* at *4. The St. Croix council had eighteen members, thirteen of which who were elected by popular vote and five who were appointed by the President. *See Id.*, at *2. Similarly, the St. Thomas-St. John council consisted of fifteen members, eleven of which were elected and four which were appointed. *Id.* Joint sessions of the councils comprised the Legislative Assembly for the Virgin Islands as a whole. *Id.* at *4.

¶12     On July 22, 1954, the Revised Organic Act was approved by Congress and restructured the government of the Virgin Islands. *See Virgin Islands v. Dowdye*, 48 V.I. 45, 56 (V.I. Super. Ct. 2006); *Bryan v. Fawkes*, 61 V.I. 201 (V.I. 2014). Under the ROA, the governor is elected by the people and the island councils were consolidated into a single body, a unicameral legislature, based in Charlotte Amalie on St. Thomas. *See* ROA § 11 and Title 2 V.I.C. §§ 101, 102. Notably, the ROA remains the *de facto* constitution of the Virgin Islands. *See Bryan* at *14.

¶13     It is the ROA that grants all three branches of government their powers and duties. Section 11 of the ROA vests the executive power in the Governor of the Virgin Islands. The Governor, as

---

[13] Act of June 22, 1936, 49 Stat. 1807; *Virgin Islands v. Dowdye*, 48 V.I. 45, 56 (V.I. Super. Ct. 2006); *see also* Sekou, Malik, et al, (Simplified) Revised Organic Act of the Virgin Islands 1954 (2021) (hereinafter "(Simplified) ROA of 1954") at 25.

chief executive officer of the Virgin Islands, "has general supervisory control of all instrumentalities of the executive branch of the Government," and is "responsible for the execution of the laws of the Government." *Bryan v. Turnbull*, 46 V.I. 167, 172 (V.I. Super. Ct. 2005).

¶14    Whereas Section 8 of the ROA grants the legislative authority and power to the Virgin Islands Legislature and requires no laws created to be inconsistent with the ROA or the laws of the United States applicable to the Virgin Islands. In 1972, the enactment of Act 3221 established two legislative districts: St. Croix and St. Thomas-St. John. *See* Title 2 V.I.C. § 102. The Legislature is comprised of fifteen (15) senators, seven (7) from each district and one (1) at-large senator who is elected territory-wide. *Id.*

¶15    Importantly, the ROA also incorporates the principle of the separation of powers into the law of the territory. It "divides the power to govern the territory between a legislative branch, an executive branch, and a judicial branch." *Bryan v. Fawkes*, at 212. Meaning, "unless otherwise expressly provided or incidental to the powers conferred, the Legislature cannot exercise executive or judicial power, the executive cannot exercise either legislative or judicial power; [and] the judiciary cannot exercise either executive or legislative power." *Id.* (quoting *Springer v. Gov't of the Philippine Islands*, 277 U.S. 189, 201-02 (1928)).

## FACTUAL BACKGROUND

### A. Act No. 8472 changed the structure of the WAPA's Board of Directors.

¶16    The controversy herein derives from the passage of Bill No. 34-0026 on May 4, 2021, which sought to amend Virgin Islands Code Title 30 § 103. Section 103 designates the members of WAPA's Governing Board, which, since 1978, consisted of nine (9) members, all of whom were appointed by the Governor. 30 V.I.C. § 103(a). Three (3) of the nine were heads of cabinet-level executive departments or agencies and served at the pleasure of the Governor. *Id.* The

remaining six (6) were private citizens who are nominated by the Governor and confirmed by the Legislature. These private citizens must be non-United States or Virgin Islands government employees and are only removable "for cause" during their three-year term. *Id.*

¶17    Bill No. 34-0026 reduced the number of Board members from nine (9) to seven (7) by eliminating two out of the three cabinet-level members and naming the Director of Energy as the sole cabinet-level board member. *See* Bill No. 34-0026, enacted as Act No. 8472. Additionally, the Bill established qualifications for the six non-governmental members, requiring the members to have formal education or experience in at least one of the following disciplines:

    (1.) Engineering, power generation;
    (2.) Energy, natural resources conservation, environmental science, planning;
    (3.) Economics, accounting, finance;
    (4.) Public affairs;
    (5.) Law; or
    (6.) Computer Technology Information Systems.

Since these members are removable only "for cause" the Director of Energy is the sole member that can be removed at will by the Governor. This revision effectively reduced the number of members who serve at the pleasure of the Governor from one-third (1/3) to one-seventh (1/7) of the Board. On August 20, 2021, Bill No. 34-0026 was enacted into law as Act No. 8472 and took effect immediately.

### B. The impacts of Act No. 8472 upon WAPA.

¶18    As an autonomous instrumentality, WAPA is governed by a board of directors and functions under its own corporate structure and in accordance with its governing documents. The corporation's bylaws were first adopted on June 1, 1981, and have been updated fifteen times

since, with the most recent revision adopted on September 29, 2016.[14] The bylaws set forth the broader rules and regulations governing the functions of the corporation, including how meetings are conducted and how the Board is structured. Whereas the Board's Governance Policies, which were adopted on November 27, 2001, specifically detail the duties and responsibilities of the governing board.[15]

¶19    WAPA's governing documents provide for two standing committees: (1.) the Finance and Auditing Committee, and (2.) the Planning and Economic Development Committee. It is here, as the parties argued, that the Act negatively impacts the operations of the Governing Board and WAPA as a whole. Article XXIX of WAPA's bylaws states, in pertinent part:

> "each [committee shall] have not less than three (3) members but no more than five (5) members. There may also be established such other committees and with such membership as the Board may decide from time to time. Committee members shall be selected by and serve at the pleasure of the Chairman."[16]

Both the Government and WAPA argue that despite the enactment of Act No. 8472, the underlying requirements in the bylaws and governance policies of WAPA remain and as such, the Act restricts their ability to convene committee meetings to carry out the business of the Authority. They also argue that the Act did not change the quorum requirements required for board meetings making it difficult to continue operations. This argument is incorrect.

¶20    By a plain reading of the Act, it is apparent that the quorum requirement was reduced to reflect the number of members on the Board, effectively changing the quorum from five (5) to four (4). Although the language is not expressly stated in the body of the Act, it is evident that the Legislature's intent, by so stating in both the preamble and the certificate of enactment, was to

---

[14] *See* Plaintiffs' Ex 1, WAPA's Bylaws.
[15] *See* Plaintiffs' Ex 2, WAPA's Governance Policies
[16] *Id.*

amend Section 104(b) to reduce the number of members constituting a quorum from five to four. Prior to Act No. 8472 the quorum requirement was five out of nine, creating a simple majority. It follows, then, that in reducing the number of members on the Board, the Legislature would reduce the quorum requirement to four, which would result in a simple majority on a seven-member Board. The argument that the quorum requirement remained the same, despite it being listed twice in the Act, is flawed and highly unlikely.

¶21     Presently, and for several months prior to the enactment of Act No. 8472, the Board has two non-governmental member vacancies.[17] As both parties believed the five-member quorum requirement remains in effect, they argue the current composition of the Board requires five of the six non-governmental members to be in attendance for Board meetings to occur. Noel Hodge, Interim Chief Executive Officer of WAPA, testified that since the passage of the Act, the Board had only been able to host one regularly scheduled meeting up until the time of the hearing. He testified that at the Board meeting held on September 16, 2021, all five non-governmental members were in attendance and therefore the Board was able to pass the Fiscal Year 2022 capital electric and water budgets, as well as the WAPA employee benefits budget.[18] He further testified many agenda items were left undiscussed or undecided because neither of the committees were able to meet because of the quorum requirement.[19]

¶22     The Board met again on October 4, 2021, for an emergency meeting. The Board needed to increase funding and grant an extension of time for the Cruz Bay, St. John, underground project.

---

[17] Testimony of Mr. Noel Hodge, Interim Chief Executive Officer of WAPA, on October 5, 2021. *See also* "About Us: Governing Board Members" of the Virgin Islands Water and Power Authority: https://www.viwapa.vi/about-us. Previously accessed August 29, 2022, and again on March 8, 2023.
[18] Testimony of Noel Hodge, October 5, 2021.
[19] *Id.*

As claimed by both parties, had the Board not convened, WAPA was faced with the challenge of not meeting a pressing deadline nor having an operating budget to continue the project, which would have resulted in a halt to a critical infrastructure project in Cruz Bay.

## PROCEDURAL HISTORY

¶23    On August 27, 2021, Plaintiffs brought an action for a Temporary Restraining Order, Injunctive Relief, and Declaratory Judgment against WAPA. On September 10, 2021, this Court denied the motion for a temporary restraining order and scheduled a preliminary injunction hearing. Prior to the hearing both parties expressed the concern for the practical day-to-day effects of the Act upon the Board, such as the Board's inability to meet regularly due to not having quorum and WAPA's failure to function efficiently. Consequently, both parties stipulated to an injunction which maintained the status quo effectively placing a hold on the enforcement of Act No. 8472 until a court ruling.

¶24    On October 5, 2021, this Court held a preliminary and permanent injunction hearing. The Court heard the sworn testimony of Noel Hodge, Interim Chief Executive Officer of WAPA, and arguments by each counsel. Hodge testified to the day-to-day affairs of WAPA, the functions of the Board, and the impacts of Act No. 8472. The Government submitted WAPA's bylaws, the Board's governing policies, the senior management organizational chart and the meeting agendas for three Board meetings held on August 19, 2021, September 16, 2021, and October 1, 2021. For the following reasons, the Court will deny the Plaintiffs motion.

## STANDARDS OF REVIEW

### I.    Injunctive Relief

¶25    When determining whether to grant a motion for either preliminary or permanent

injunction, the Court considers the following factors on a sliding-scale basis: 1) the probability of success on the merits; 2) the threat of irreparable harm if the injunction is denied; 3) the balance of the harm between the parties if granted; and 4) the public interest. *3RC & Co. v. Boynes Trucking Sys., Inc.* 63 V.I. 544, 553 (V.I. 2015). The sliding-scale standard requires the Court to "make findings on each of the four factors and determine whether – when the factors are considered together and weighed against one another – the moving party had made a clear showing that [it] is entitled to [injunctive] relief. *Id.* at 557. "Unlike a preliminary injunction, which requires only a showing of probability of success on the merits, to obtain a permanent injunction, the moving party must demonstrate actual success on the merits of the claim." *Sam's Food Distributors, Inc. v. NNA & O, LLC*, 2020 WL 3086468 *5 (V.I. 2020). "[T]he party seeking an injunction [bears] the burden of proof as to all four factors." *Id.* (quoting *Appleyard v. Gov. Juan F. Luis Hosp. & Med. Ctr.*, 61 V.I. 578, 591 (V.I. 2014).

## II.    Declaratory Judgment

¶26    Here, both parties seek to declare Act No. 8472 invalid as a violation of the ROA. The United States Supreme Court has stated that the "ultimate and supreme function of courts" is to determine whether an act is constitutional or not. *Muskrat v. U.S.*, 219 U.S. 346, 359-60 (1911). However, this function is only "legitimate [] in the last resort, and as a necessity in the determination of real, earnest, and vital controversy between individuals. It never was the thought that, by means of a friendly suit, a party beaten in the legislature could transfer to the courts an inquiry    as    to    the    constitutionality    of    the    legislative    act." *Id.* Further, Article III, section 2 of the United States Constitution restricts "judicial power" to the resolution of "Cases" and "Controversies." *Legislature of the Virgin Islands v. DeJongh*, 645 F.Supp.2d 452,

457 (D.V.I. 2009) (citing *Sprint Commc'ns Co. v. APCC Servs., Inc.,* 554 U.S. 268 (2008)). This requirement is satisfied only when a plaintiff has standing. *Id.* To establish standing, a plaintiff must allege:

> "(1) an injury in fact (i.e., a "concrete and particularized" invasion of a "legally protected interest"); (2) causation (i.e., a "fairly ... trace[able]" connection between the alleged injury in fact and the alleged conduct of the defendant); and (3) redressability (i.e., it is "likely" and not "merely speculative" that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit)."

*Id.* at 458. Standing requires more than an "abstract legal dispute," and the plaintiff must establish a "personal stake" in the dispute. *See Id.* Further, when a plaintiff seeks declaratory judgment, he has standing if "there is substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* (quoting *St. Thomas – St. John Hotel & Tourism Ass'n, Inc. v. Gov't of the V.I.,* 218 F.3d 232, 240 (3d Cir. 2000). In this matter, the Government has alleged the Act will impede the Governor's duty to faithfully execute the laws under the powers bestowed upon him by the ROA. This presents a non-political question, therefore a valid justiciable controversy of whether the Legislature acted within its authority when enacting Act No. 8472 as it implicates the separation of powers doctrine.

¶27    Plaintiffs move for declaratory judgment requesting the Court declare Act No. 8472 void *ab initio* for violating the separation of powers doctrine. Pursuant to the Declaratory Judgment Act, codified at 5 V.I.C. §§ 1261-1272, this Court has the "power to declare [the] rights, status, and other legal relations [irrespective of] whether or not further relief is or could be claimed." *Pate v. Government of the Virgin Islands,* 2015 WL 1937701 *6 (V.I. Super. Ct. 2015). The Court has discretion to entertain a declaratory action when the matter involves an actual and justiciable controversy. *See Id.*

14

## ANALYSIS

¶28    Before addressing the merits of the injunction, this Court is mindful of its role in our tripartite system of government and notes that "duly enacted legislation enjoys a 'presumption of constitutionality.'" *Gumbs v. Schneider Regional Medical Center*, 2020 WL 6261273 \*3 (V.I. Super. Ct. 2020) (quoting *Kell v. Davies*, 63 V.I. 462, 472 (V.I. Super. Ct. 2015)). "The Court emphasizes that '[t]he people of the Virgin Islands speak through the voice of [the] Legislature' and the judiciary does not sit to second-guess its informed judgment." *Id.* (quoting *Azille v. People of the V.I.*, 59 V.I. 215, 228 (V.I. 2012)); *see also Dennis v. United States*, 341 U.S. 494, 539-40 (1951) ("How best to reconcile competing interests is the business of legislatures, and the balance they strike is a judgment not to be displaced by ours, but to be respected unless outside the pale of fair judgment."). Considering this, the Court turns to the determination of the justiciability on the action brought forth.

¶29    First, it must be distinguished that Plaintiffs are bringing a facial challenge, rather than an as-applied challenge, to Act No. 8472. "[A] facial challenge tests a law's constitutionality based on its texts alone and does not consider the facts or circumstances of a particular case..." *See People of the V.I. v. Rosario*, 62 V.I. 429, 434 (V.I. Super. Ct. 2015). "When making a facial challenge, the challenger bears the burden of proving the statute could never be constitutionally applied." *See Gumbs v. Schneider Regional*, at \*3 (citing *United States v. Salerno*, 481 U.S. 738, 746 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exist under which the Act would be valid."). When bringing a facial challenge, "a party seeks to vindicate not only his own rights, but those of others who may also be adversely impacted by the statute in

15

question." *People of the Virgin Islands v. Rosario*, 62 V.I. 429, 434 (V.I. Super. Ct. 2015) (quoting *Chicago v. Morales*, 527 U.S. 41, 55 n.22 (1999)). "The United States Supreme Court has cautioned, however, [the Court must] 'not go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Id.* quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008). On the other hand, however, an as-applied challenge "does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right." *Rosario* at 434.

¶30    Here, the question is whether, on its face, Act No. 8472 is unconstitutional and violates the Revised Organic Act of 1954. As will be explained, Plaintiffs have not shown that Act No. 8472 is unconstitutional.

## I.    The ROA vests distinct and separate powers to each branch of government.

¶31    The Revised Organic Act of 1954 applies the separation of powers doctrine to the Virgin Islands, dividing the powers of the Government into three co-equal branches, the Executive, Legislative, and Judicial branches. *See Balboni v. Ranger American of the V.I., Inc.*, 70 V.I. 1048, 1084 (V.I. 2019). The legislative power of the territory is "vested in the Legislature and that power and authority extends to all rightful subjects of legislation." *Creque v. Roebuck*, 16 V.I. 197, 205 (V.I. Terr. Ct. 1979). The Legislature is expressly given the authority to "amend, alter, modify, or repeal any local law or ordinance, … and to enact new laws not inconsistent with any laws of the United States applicable to the Virgin Islands." ROA § 8(c). Within this broad authority comes the Legislature's ability to create administrative agencies and design their organizational structures, such as determining whether an agency should have a multi-member commission or a single head

of department or whether there is a necessity to establish certain statutory qualifications for appointees and removal provisions. Notably, it is a "well-established principle that [a] subsequent legislature may alter or amend acts of its predecessor," including to "restructure WAPA at anytime, so long as the new law does not conflict with federal law." *Chiang v. Turnbull*, 43 V.I. 49, 64 (V.I. Terr. Ct. 2000); *see e.g., Greer v. People*, 74 V.I. 556, n. 33 (V.I. 2021) (finding that the Virgin Islands Legislature had expanded the application of the common law and concluding that for the Legislature to do so, it must utilize its inherent powers to amend the statute.).

¶32 As with the Legislative branch, the Executive branch also possesses its own powers. The Governor's powers are vested to him in Section 11 of the ROA, stating, in pertinent part:

> "The Governor shall have general supervision and control of all the departments, bureaus, agencies, and other instrumentalities of the executive branch of the government of the Virgin Islands. ... He shall appoint, and may remove, all officers and employees of the executive branch of the government of the Virgin Islands, except as otherwise provided in this or any other Act of Congress, or under the laws of the Virgin Islands, and shall commission all officers that he may be authorized to appoint. He shall be responsible for the faithful execution of the laws...."

The Governor's power rests in his ability to enforce laws and "appoint the agents charged with the duty of such enforcement." *Springer v. Philippine Islands*, 277 U.S. 189, 201, 202 (1928). Importantly, this right is not absolute and may be limited in a statute by the Legislature. *See* ROA § 11.

¶33 The matter at hand involves analyzing both the legislative and executive powers bestowed under the ROA to determine if the enactment of Act No. 8472 is a valid exercise of the Legislature's authority. Here, as stated *supra*, WAPA was legislatively created as a "body corporate and politic constituting a public corporation and autonomous governmental instrumentality of the Government of the Virgin Islands." Title 30 V.I.C. § 103. The Virgin Islands

Supreme Court has held that public corporations are considered a part of the Executive branch. *See V.I. Taxi Ass'n v. West Indian Co., Ltd.*, 66 V.I. 473, 484 (V.I. 2017). Plaintiffs argue that because WAPA resides in the Executive branch, the reduction of cabinet-level members on the Board impedes the Governor's ability to carry out his duties to exercise general supervision and control of executive agencies under Section 11. This authority, however, does not surpass the Legislature's inherent power to alter and amend statutes regarding the structure of legislatively created government instrumentalities. There is a general principle that "the Legislature has the power to take away by statute that which has been given by statute except when to do so would amount to an impairment of a vested right." *The Pentheny, Ltd. v. Government of the Virgin Islands*, 360 F.2d 786, 791 (3d Cir. 1966). The parties argue that Act No. 8472 violates the separation of powers doctrine by impeding on the Governor's vested right to exercise general supervision and control of WAPA by limiting his right to appoint and remove officers to the Board and therefore the Act should be void *ab initio*. This Court is not convinced. Inherent in the Legislature's authority is the power to amend and create laws, and absent a showing that the Legislature has acted improperly or arbitrarily in enacting Act No. 8472, the Court will not interfere with the Legislature's reasoned judgment.

## II. Plaintiffs fail on the merits.

### a. Act No. 8472 does not violate the ROA nor the Separation of Powers Doctrine.

¶34    Plaintiffs argue Act No. 8472 interferes with the Governor's faithful execution of the laws by illegally diminishing his control and supervision of the Board, as required under the ROA, thereby violating the separation of powers doctrine.[20] Specifically, Plaintiffs insist the Act violates the separation of powers doctrine for several reasons:

---

[20] *See* Plaintiffs' motion at 5.

(1.) the Act removed two of the three cabinet-level members from the WAPA Board,[21]

(2.) the Act appointed the Director of Energy as the sole cabinet-level member of the Board,[22]

(3.) the remaining six non-government members of the Board can only be removed for cause,[23] and

(4.) because the WAPA Board is not quasi-judicial or quasi-legislative, the Legislature may not restrict the Governor's removal power in any way.[24]

¶35    "The separation of powers doctrine lies at the heart of our constitutional structure of government. In establishing the three branches of government, the Legislative, the Executive, and the Judicial, the Framers conferred separate and distinct powers on each, together with correlative checks and balances, as a safeguard against the encroachment of aggrandizement of one branch at the expense of another." *Sekou v. Moorhead*, 2020 WL 1970723 *14 (V.I. 2020) (quoting *United States v. Scott*, 688 F.Supp. 1483, 1488 (D N.M. 1988)). The doctrine "prohibits any branch of government from exercising powers that are reserved for the other branches, unless such an exercise is expressly provided [in the ROA] or incidental to the powers that a branch necessarily has." *Dunston v. Mapp*, 2016 WL 39776642 at *7 (D.V.I. 2016). The Virgin Islands Supreme Court has set forth a two-prong test to determine the existence of a separation of powers issue. This Court must examine: "the extent to which [the challenged statute] prevents the [particular] Branch from accomplishing its constitutionally assigned functions…. [and] [i]f it does, a further inquiry must be made as to whether that impact is justified by an overriding need to promote objectives within the constitutional authority of the acting branch." *Sekou v. Moorhead*, at *15 (quoting *Scott* at 1490).

---

[21] Compl. at ¶39.

[22] *Id.* at ¶44.

[23] *Id.* at 47.

[24] *See* Plaintiffs' motion at 6.

### i.    WAPA's relationship with the Executive Branch.

¶36     To begin the analysis, it is important to note that WAPA was created by the Legislature in 1964 as "a public corporation and autonomous governmental instrumentality" managed by its own Governing Board "for the purpose of developing and providing water and electric power services for the people of the Virgin Islands." *V.I. Public Services Comm'n v. V.I. Water & Power Auth.*, 56 V.I. 508, 511 (V.I. 2012). The Virgin Islands Code treats public corporations as public agencies. *V.I. Taxi Ass'n v. West Indian Co., Ltd.*, 66 V.I. 473, 485 (V.I. 2017). As "there is no fourth branch of government," public corporations are considered to be a part of the Executive branch. *See St. Croix Avis v. West Indian Co., Ltd.*, 71 V.I. 39, 59 (V.I. Super. Ct. 2019). However, courts in the Virgin Islands have consistently held these public corporations enjoy a "substantial degree of autonomy and independence from the Executive Branch." *Najawicz v. People*, 2022 WL 574765 at *7 (V.I. 2022); *see also V.I. Taxi Ass'n v. West Indian Co., Ltd.*, 66 V.I. 473, 485 (V.I. 2017) (holding "[i]n enacting Act 5826, the [Virgin Islands] Legislature determined that WICO should operate as a private corporation. We presume that the Legislature intends for its acts to operate harmoniously with the common law, unless a contrary indication appears in the text of an act. Since Act 5826 does not purport to modify the common law, we conclude that the Legislature intended for WICO to exercise the decision making authority that a private corporation would enjoy at common law..."); *Cyprian v. Butcher*, 53 V.I. 224, 227 (V.I. Super. Ct. 2010) (stating "[p]oignantly, from its inception, WAPA was established as 'a corporation having legal existence and personality *separate and apart* from the Government.'").

¶37     In fact, WAPA has been challenging its own relationship with the Executive branch for over a decade in regard to the control that the Public Services Commission ("PSC") has over setting WAPA's rates. In *V.I. Public Services Comm'n v. V.I. Water & Power Auth*, 49 V.I. 478 (V.I.

2008), the PSC argued that it had general oversight authority over WAPA. *Id.* at 483. The Virgin

Islands Supreme Court held that the Legislature intended for the PSC to have power over WAPA

as to rate fixing but does not have general oversight authority over WAPA. *Id.* at 488. The Supreme

Court looked to WAPA's statute which provides, in pertinent part:

> "Nothing in this chapter shall be construed as exempting the Virgin Islands
> Water and Power Authority from any law *made specifically applicable thereto or
> generally applicable to independent instrumentalities* of the Government of the
> United States Virgin Islands, whether such law was enacted before, on, or after
> February 14, 1980."

30 V.I. § 122. The Court held this language "subjects WAPA only to laws that are specific to

WAPA and those that apply generally to independent instrumentalities." *Id.* at 488. This was

affirmed when the PSC challenged its authority over WAPA again in 2012 when it argued the PSC

does not have authority to settle billing disputes between WAPA and its customers. *V.I. Public

Services Comm'n v. V.I. Water and Power Authority*, 55 V.I. 508, 511 (V.I. 2012). The Court held

that PSC's authority to settle billing disputes is between public utilities only; and that "in the

absence of a statute specific to WAPA or generally applicable to independent instrumentalities,

'section 122 is not a pathway to subject WAPA to PSC's [] powers.'" *Id.* at 514.

¶38     WAPA has a unique structure as it is required to develop and provide adequate water and

electric power systems to benefit the public, but it is also designed to maximize profits as a

corporation. 30 V.I.C. § 105. It can be inferred that the Legislature designed WAPA particularly

this way by granting WAPA certain enumerated powers that other Executive branch agencies do

not have. For example, WAPA has the ability to "make contracts and execute all instruments

necessary," "acquire property, real, personal, or mixed, tangible or intangible," and to "have

complete control and supervision of facilities and properties or acquired by it." *Id.* at §§ (5), (6),

(13). Other instrumentalities, such as the Virgin Islands Port Authority and the Public Finance

bAuthority, also have similar enumerated powers which purely Executive branch agencies do not have.[25] Having established that WAPA resides in the Executive branch, but that the Executive branch is limited in its control over WAPA, unlike purely executive-level agencies, the Court now turns to whether Act No. 8472 runs afoul of the ROA.

ii.     **Act No. 8472 does not impede on the Governor's right to exercise general supervision and control by decreasing the cabinet-level members of the Board from three to one.**

¶39     Act No. 8472 restructures WAPA's Board by reducing the number of members from nine to seven by eliminating two out of three members from among the heads of cabinet-level executive departments or agencies. Plaintiffs posit that this restructuring impermissibly violates § 11 of the ROA by eliminating two of the executive cabinet-level officers who were traditionally appointed by the Governor to serve on the Board. *See* Compl. ¶¶39, 41.

¶40     They argue this impedes the Governor's statutory duty to have "general supervision and control of ... the executive branch," which includes the powers to "appoint, and [] remove, all officers and employees of the executive branch..."[26] In *Sekou v. Moorhead*, the Supreme Court of the Virgin Islands commented on the scope of the general supervision and control vested to the Governor, stating: "[t]he executive branch's power primarily encompasses its ability to enforce laws created by the Legislature as well as to appoint agents to enforce the Legislature's laws." *Sekou* at *16. Plaintiffs argue this broad scope of authority vested to the Governor allows him to

---

[25] *See* Title 29 V.I.C. § 919 (granting the Public Finance Authority with its enumerated powers); *see also* Title 29 V.I.C. § 543 (establishing the enumerated powers of the Port Authority). Compare with Title 3 VI.C. § 4 (detailing the duties of the Office of Management and Budget as established within the Office of the Governor.)

[26] Section 11 of the ROA, in pertinent part, provides the Governor with the authority to: "[H]ave general supervision and control of all the departments, bureaus, agencies, and other instrumentalities of the executive branch of government of the Virgin Islands. ... He shall appoint, and may remove, all officers and employees of the executive branch of the government of the Virgin Islands, except as otherwise provided in this or any other Act of Congress. ... He shall be responsible for the faithful execution of the laws of the Virgin Islands, the laws of the United States..."

appoint and remove any executive officer at his will, and that this power to do so is vital to the Governor's ability to "implement executive policy [and] allow [the Governor] to fulfill his organic duty of faithful execution of the laws."[27]

¶41    Plaintiffs state the Legislature's mandate that the Director of Energy serves on the Board with six non-governmental members, whom are only removable for cause, hinders the Governor's control and supervision of the Board by depriving him of the ability to exercise control over the views and priorities of the Board.[28] This argument relies on the premise that because the Governor has historically retained the ability to appoint and remove three cabinet-level members at his will, any limitation to this power is a violation of the ROA. The Court disagrees.

¶42    Act No. 8472 restructured WAPA's board to function like a body of nonpartisan experts.[29] The Legislature has the authority to alter and amend statutes so long as they are not inconsistent with any other laws. *See* ROA § 8(c). While Act No. 8472 mandates that the Director of Energy serve on the Board, this mandate does not rise to a violation of the separation of powers. The Governor's absolute power of appointment and removal is only unrestricted for purely executive officers. This power is not infringed upon by the appointment of the Director of Energy to WAPA's Board, as Plaintiffs suggest, because the Governor retains his absolute authority to appoint and remove the director at his will.

¶43    Furthermore, the Legislature created WAPA, not the Executive branch. The Legislature retains the authority to restructure the Board as it sees fit. While most of the public corporations

---

[27] Plaintiffs' motion at 4.

[28] *Id*. at 9.

[29] *See also Humphrey's Ex'r v. United States*, 295 U.S. 602 (1935).

in the Virgin Islands have cabinet-level members on their governing boards,[30] the Court searched

and did not find any authority, whether by Congress, the ROA, or any other, to support the notion

that the Legislature is required to include cabinet-level members on the boards of autonomous

agencies. Thus, inherent in its authority is the power for the Legislature to determine who, if any,

cabinet members are on the board. Requiring the Director of Energy to be on the Board and

establishing the expertise for non-governmental members signals to the Court that the

Legislature's intent in passing Act No. 8472 is to ensure WAPA is being led by a body of experts,

who can manage and direct WAPA to fulfill its roles as required under Title 30 V.I.C. § 105. All

seven members of the Board are appointed by the Governor and the six non-governmental

members remain removable for cause. To argue that reduction of cabinet-level members from one-

third to one-seventh impairs the Governor's ability to execute policy measures does not outweigh

the Legislature's authority bestowed upon it by the ROA. The Board is not, nor should it be,

structured to function as a bipartite board. In other words, the three cabinet-level officers are not

separate and distinct from the six non-governmental officers. They were all appointed by the

Governor and approved with the advice and consent of the Legislature. Therefore, the Board

should be treated as one unit and function as such. Hence, the execution of the Governor's policies

---

[30] *See* Title 29 V.I.C. §§ 541(a)(b) (establishing the Virgin Islands Port Authority as a public corporation with a governing board consisting of the Commissioner of Tourism, the Attorney General, the Chairman of the Economic Development Authority and five other persons appointed by the Governor with the advice and consent of the Legislature and removable for cause by the Governor.); *see also* Title 29 §§ 31, 32 (providing that the Housing Authority is a public body corporate and politic and that its governing board consists of "seven Commissioners, not more than two of whom, excluding the Executive Director of the Virgin Islands Housing Finance Authority and the Commissioner of Human Services, shall be at any time salaried officials or employees of the Government..."); *see also* Title 29 §§ 918, 919 (establishing the Public Finance Authority as a public corporation and autonomous governmental instrumentality with a governing board consisting of the Governor, the Commissioner of Finance, the Director of Office of Management and Budget, and four non-governmental members experienced in municipal finance.").

and goals for the direction of WAPA are not vested in three cabinet level officers, but in seven board members.

¶44    Since the Act requires prerequisite qualifications for serving on the Board, a foundation has been laid to ensure the non-governmental members are not only vetted accordingly, but the Governor in this process can determine if, and to what extent, the non-governmental members philosophies are aligned with his policy goals for the Authority. Further, nothing prohibits the Plaintiffs from re-organizing the manner in which they put forth, develop, and carry out their policies. As stated, there is no inherent power establishing that there must be three cabinet-level members on the Board, and because that is the way the Board functioned for the last 45 years, it does not mean it should function as such in perpetuity. Thus, Act No. 8472 does not impermissibly restrict the Governor's ability to exercise supervision and control of the Board.

### iii.    The "for cause" removal protection for non-governmental members granted under Act No. 8472 does not run afoul of the separation of powers.

¶45    Plaintiffs rely on *Humphrey's Ex'r v. United States*, 295 U.S. 602 (1935), to argue the established exceptions allowing "for cause" removal protections do not apply and that ROA § 11 grants the Governor the absolute right to remove the members of the WAPA Board.[31] Plaintiffs cite to several cases, in the Virgin Islands and elsewhere, to support their argument that the Governor has the sole authority to appoint and remove officers at will, but Plaintiffs' narrow interpretations of the cases do not align with the established precedent regarding appointment and removal at the federal, state, and territorial levels. Each case is analyzed *infra*.

### b.  "For cause" Removal at the Federal Level.

¶46    To determine whether the Legislature has violated the separation of powers doctrine, this

---

[31] Plaintiffs' motion at 6.

Court will analyze the executive power of removal at the federal, state, and territorial levels. This analysis is not new as the United States Supreme Court has been analyzing the extent of the executive's appointment and removal powers for almost 100 years. In *Myers v. United States*, 272 U.S. 52, 116 (1926), the Supreme Court illustrated the Founders' debate of whether, pursuant to Article II of the United States Constitution, the executive function of removal was incidental to the power of appointment vested to the President under Article II. The Supreme Court ultimately held that the President's express mandate to take care that the laws are faithfully executed includes the power to remove officers who fail to do so. Since *Myers*, the Supreme Court has upheld two exceptions to the President's unrestricted removal power. First, Congress can create "expert agencies led by a *group* of principal officers removable by the President only for good cause." Second, Congress can "provide tenure protections to certain *inferior* officers with narrowly defined duties." *Seila Law LLC v. Consumer Financial Protection Bureau*, 140 S.Ct. 2183, 2192 (2020) (hereinafter "*Seila Law*"); *see also Morrison v. Olson*, 487 U.S. 654 (1988).

¶47   The first case to uphold "for cause" removal was *Humphrey's Ex'r*, where the Supreme Court held that the officers of the Federal Trade Commission ("FTC") could only be removed for cause, as designated by Congress. The Court came to this conclusion after a thorough examination of the type of agency and the officers at issue. The FTC was created by Congress "to carry into effect legislative policies embodied in the statute... and to perform other specified duties as a legislative or judicial aid... Its duties are performed without executive leave and, in the contemplation of the statute, must be free from executive control." *Id.* at 628. Further, the Court looked at the type of officers at the FTC stating, "its members are called upon to exercise the trained judgment of a body of experts 'appointed by law and informed by experience'." *Id.* at 624.

26

The Court further explains the FTC is different from other executive agency boards because "[t]he commission is to be nonpartisan; and it must, from the very nature of its duties, act with entire impartiality. It is charged with the enforcement of no policy except the policy of the law. Its duties are neither political nor executive, but predominantly quasi-judicial and quasi-legislative." *Id.* Because of the quasi-judicial and quasi-legislative functions of the FTC, the Court concluded that Congress's intent was to create an impartial agency, independent of the President; therefore, the Court held that its officers may only be removed for the causes named in the applicable statute. *Id.* at 632. Importantly, the Court emphasized that the constitutionality of "for cause" removal clauses will depend on the character of the office and that the unrestricted power emphasized in *Myers* is confined to purely executive offices. *Id.*

¶48    In 1988, the Supreme Court again created an exception allowing for statutorily given "for cause" removal protections in *Morrison v. Olson*, 487 U.S. 654 (1988). Ten years prior, Congress enacted the Ethics in Government Act which created a special court that was authorized to appoint an independent counsel to investigate and prosecute violations of federal law by government officials. *Id.* The appellees in the case argued that the Act violated the separation of powers principle because the independent counsel could only be removed for cause by the Attorney General. The Supreme Court, dialing back the broad scope granted in *Myers* and the limitation in *Humphrey's Ex'r*, stated:

> "The determination of whether the Constitution allows Congress to impose a "good cause"-type restriction on the President's power to remove an official does not turn on whether or not that official is classified as "purely executive." The analysis contained in this Court's removal cases is designed not to define rigid categories of those officials who may or may not be removed at will by the President, but to ensure that Congress does not interfere with the President's exercise of the "executive power" and his constitutionally appointed duty to "take care that the laws be faithfully executed..."

*Id.* at 657-58. The Supreme Court held that for cause protection for the independent counsel did not impermissibly interfere with the President's removal power. The Court noted the difference between a *principal* officer, loosely defined as officers selected by the President with the advice and consent of the Senate and (generally) serves at the will of the President, and an *inferior* officer, which is usually a "subordinate officer" who has limited and specific duties and under the supervision of a principal officer. *Id.* at 672. The Court then reasoned that the independent counsel's authority was within a limited scope because he could not make widespread decisions interfering with the duties of the Executive branch, therefore the independent counsel was an inferior officer. *See Id.* Further, the Court stated that the Attorney General was able to remove the independent counsel for cause, and the Attorney General was removable at will by the President. *Id.* at 682. Therefore, the Attorney General has broad authority over the independent counsel, including whether to appoint an independent counsel. Thus, the Supreme Court held that the Act was "not [] an attempt by Congress to increase its own powers at the expense of the Executive Branch," and further reasoned that although the counsel is "'independent' and free from Executive Branch supervision ... the Act gives the Executive Branch sufficient control over the independent counsel to ensure that the President is able to perform his constitutionally assigned duties." *Id.* at 658.

¶49     The Supreme Court visited the topic of "for cause" removal again in *Seila Law*. Plaintiffs rely on *Seila Law* to argue the Legislature "may not restrict the Governor's removal power."[32] Also, that *Seila Law* supports the notion that the "ultimate question" is whether the Act "...impedes the President's ability to perform his constitutional duty." Here, Plaintiffs are implying that *Seila*

---

[32] Plaintiffs' motion at 6.

*Law* overturns the exceptions to the absolute power of removal granted in both *Humphrey's Ex'r* and *Morrison*. That is not the case. The question in *Seila Law* was whether the single Director of the Consumer Financial Protection Bureau ("CFPB") can only be removed for cause. *Id. at 2192*. The Supreme Court stated this was unconstitutional because the Director of the CFPB is a single principal officer whose duties are far from limited. The Director's responsibilities included creating binding rules regarding mortgages, student loans, credit card payments, and more. This single director had "the coercive power of the state to bear on millions of private citizens and businesses, imposing potentially billion-dollar penalties through administrative adjudications and civil actions." *Seila Law*, at 2187. Ultimately, the Court held that having a single director of an agency be protected by for cause removal provisions was unconstitutional because it limited the President's ability to manage the government.

¶50    However, contrary to Plaintiffs' position, *Seila Law* left in place the two recognized exceptions allowing "for cause" removal protections outlined in *Humphrey's Ex'r* and *Morrison*. *Seila Law*. at 2192. The Court explained that Congress is allowed to give for cause removal protections to "multimember body of experts, balanced along partisan lines, that performed legislative and judicial functions and was said not to exercise any executive power," as in *Humphrey's Ex'r. Id*. at 2199. Importantly, the Court in *Seila Law* also explained that the exception granted in *Morrison* was a "[b]acking away from the reliance ... on the concepts of 'quasi-legislative' and 'quasi-judicial' power, [instead] we viewed the ultimate question as whether a removal restriction is of 'such a nature that [it] impede[s] the President's ability to perform his constitutional duties.'" *Id*.

### c. "For cause" Removal at the State and Territorial Levels.

¶51    Different state and Virgin Islands courts have analyzed the exceptions outlined in *Humphrey's Ex'r* and *Morrison*. To begin the analysis as applied to states and territories, this Court will start with the two primary cases Plaintiffs rely on to support their argument that the Governor's power of removal is absolute under the Revised Organic Act. Then, the Court will consider how other jurisdictions have interpreted the exceptions established in *Humphrey's Ex'r* and *Morrison* to further its analysis.

¶52    First, Plaintiffs argue the recent holding in *Bryan v. Hosp. Health Facilities Corp.*, 2021 WL 3292439 (V.I. Super. Ct. 2021), requires this Court to declare Act No. 8472 void *ab initio* on the premise that, similar to the Hospital Corporation's Board, WAPA's Board "has no quasi-judicial or quasi-legislative functions," and "[t]herefore, the Legislature may not restrict the Governor's removal power in any way."[33] However, WAPA's Board is distinguishable from the Government Hospital Boards and the different legislative acts are also distinguishable. In *Hosp. Health Facilities Corp.*, the legislation restructured both the Board of Directors and the two district governing boards. The Act restructured the Board of Directors to consist of:

> "[T]hirteen (13) members as follows: five (5) members representing the District Board of St. Croix, five (5) members representing the District Board of St. Thomas-St. John, and three (3) cabinet level members or appropriate designee. Members appointed by the District Boards will be comprised of two doctors elected by their respective members of the District Boards, two (2) nurses, two (2) Attorneys, two (2) Certified Public Accountants, and two (2) Engineers or Architects one each from the Districts of St. Croix and St. Thomas/St. John. Cabinet members include the Director of Property & Procurement, the Director of the Office of Management and Budget or Commissioner of Finance and an additional cabinet level member or appropriate designee appointed by the Governor."

*See* Act No. 8438(a). The Act also restructured the two district governing boards providing:

---

[33] Plaintiffs' motion at 6-7.

> "Each district board shall have nine members, all of whom shall represent their respective island district. District Board members shall serve terms of three years. Two members shall be doctors elected by their respective members of the Association of Hospital Employed Physicians. One member shall be a nurse elected by the Virgin Islands Nurses Association. One member shall be an Attorney elected by their respective members of the Virgin Islands Bar Association. One member shall be a Certified Public Accountant elected by their respective members of the Virgin Islands Board of Accountancy. One member shall be an Engineer or Architect elected by their respective members of the Virgin Islands Board of Architects, Engineers and Land Surveyors. Three members of each district board shall be appointed by the Governor with the advice and consent of the Legislature, one of which shall be a member of the Chamber of Commerce. Members appointed by the Governor shall not serve on the Board of Directors of the Corporation. No person appointed to represent a district may reside in a district different from that which he has been appointed to represent."

*See* Act No. 8438(e). Importantly, prior to Act 8438, the Governor appointed all fifteen members of the Government Hospital Boards and allowed him to remove any member "for cause." *See* Act No. 6012(h). The Legislature removed the "for cause" provision in Act No. 8438 and the plaintiffs incorrectly argued this eliminated the Governor's ability to remove directors on the Boards. A traditional analysis of *Humphrey's Ex'r* was conducted, and that court determined that the Government Hospital Boards were executive in nature, and neither quasi-judicial nor quasi-legislative. However, the court held: "the complete elimination of the Governor's power to remove would run afoul of the separation of powers. The Legislative Branch can place limits on the executive's power to remove, but to eliminate the executive from the removal process altogether is a violation of the separation of powers." *Hosp. Health Facilities Corp.*, at *4.

¶53     This Court disagrees with the reasoning provided in *Hosp. Health Facilities Corp.* While Act No. 8438 was silent as to removal provisions, the Act placed three members of the Governor's cabinet on the Board of Directors, implying they are removable at the will of the Governor. Further, the Act provides that the members on both boards shall serve terms of three years. *See* Act No. 8438 (b)(e). As explained *infra*, absent an explicit provision to the contrary (i.e., a provision

31

establishing "for cause" removal protections), when the Legislature only places term limits on members of executive boards, it is inherent in the Executive's authority to remove those members at his will. *See infra, Spicer v. Biden,* 2021 WL 5769458 (D.D.C. 2021). It can be inferred from the inherent appointment and removal powers of the Governor, and the long line of precedent establishing this principle, that the Legislature's removal of the "for cause" provision implies the Governor can remove the members at will. Further, the analysis overlooks the exception laid out in *Morrison,* which considers the unique characteristics of the office and the Legislature's intent in creating the office when determining whether "for cause" protections are valid.

¶54    Finally, Act No. 8472 is wholly distinguishable from Act No. 8438 because Act No. 8472 explicitly provides "for cause" removal protections for non-governmental members. Here, it is expressly stated that the Governor's ability to remove members was not eliminated, therefore the separation of powers question is different than the one presented in *Hosp. Health Facilities Corp.* Thus, *Hosp. Health Facilities Corp.* is inapplicable to the matter *sub judice.*

¶55    Then, Plaintiffs rely on *Cooper v. Berger,* 809 S.E.2d 98 (N.C. 2018) to argue that because only one board member serves at the pleasure of the Governor, the remaining six members, who are only removable for cause, may or may not have been appointed by the sitting governor.[34] They posit that this possibility interferes with the Governor's control of the Board and impedes his organic duty.[35] However, Plaintiffs reliance on *Cooper* is misplaced.

¶56    In *Cooper,* the General Assembly of North Carolina abolished two state agencies, State Board of Elections and State Ethics Commission, and created a new Bipartisan State Board of Elections and Ethics Enforcement ("Bipartisan State Board"). The bill also appointed the previous

---

[34] Plaintiffs' motion at 9.
[35] *See* Plaintiffs' motion at 9.

32

members of the State Ethics Commission to serve on the Bipartisan State Board and further set out

the requirements for the Bipartisan State Board, stating, in pertinent part:

> "(a) The State Board shall consist of eight individuals registered to vote in North Carolina, appointed by the Governor, four of whom shall be of the political party with the highest number of registered affiliates and four of whom shall be of the political party with the second highest number of registered affiliates, as reflected by the latest registration statistics published by the State Board. The Governor shall appoint four members each from a list of six nominees submitted by the State party chair of the two political parties with the highest number of registered affiliates, as reflected by the latest registration statistics published by the State Board.
>
> ....
>
> (c) Members shall be removed by the Governor from the State Board only for misfeasance, malfeasance, or nonfeasance. Violation of G.S. § 163A-3(d) shall be considered nonfeasance."

The Supreme Court of North Carolina looked at the statute as a whole and considered the functions

of the board, stating the board which "has responsibility for the enforcement of laws governing

elections, campaign finance, lobbying and ethics, clearly performs primarily executive, rather than

legislative or judicial, functions." Further holding that this statute:

> "leave[s] the Governor with little control over the views and priorities of the Bipartisan State Board.... by requiring that a sufficient number of its members to block the implementation of the Governor's policy preferences be selected from a list of nominees chosen by the leader of the political party other than the one to which the Governor belongs, limiting the extent to which individuals supportive of the Governor's policy preferences have the ability to supervise the activities of the [Board] and significantly constraining the Governor's ability to remove members of the Bipartisan State Board."

Act No. 8472 is vastly different from the board in *Cooper* because the Governor has full authority

to appoint the Director of Energy and whomever he chooses for the six non-governmental

positions, as long as they meet the professional qualifications set out by the Legislature. Whereas

in *Cooper*, the Governor had to choose between lists submitted by the two largest political parties

in the state, resulting in the Governor being forced to choose members whose policy goals may

not align with his own. This is wholly different from the legislation at bar, which does not restrict the Governor's appointment power to a set of lists and rather, only establishes criteria for appointment. Thus, the Court finds *Cooper* to be restrictive and inapplicable.

¶57    Besides these cases, there have been other courts which have upheld removal protections under the standards of both *Humphrey's Ex'r* and *Morrison*. Though unbinding on this Court, these cases are instructive of whether the "for cause" removal protections granted in Act No. 8472 is constitutional.

¶58    In *Arneson v. Wolf*, 117 A.3d 374, 376 (Pa. Commw. Ct. 2015), the Commonwealth Court of Pennsylvania analyzed whether the Governor had the authority to remove the Executive Director of the Office of Open Records ("OOR"), an office created to apply the statutory standard under the states' "Right-to-Know Law." That court stated, "if the legislature creates a public office, it may impose terms regarding tenure and removal as it sees fit, and if the legislature intends for an agency to be "independent," then the legislature has the authority to circumscribe the Governor's removal power. *Id.* at 377. The court analyzed the features of the agency, including its structure, function, duties, and statutory purpose and the legislative intent in its creation, and determined the OOR was a "quasi-judicial tribunal," and "independent from the executive branch and [therefore] insulated from the Governor's constitutional power to remove appointees at-will." *Id.* at 376-77.

¶59    In *Pievsky v. Ridge*, 98 F.3d 730, 734 (3d. Cir. 1996), the Third Circuit stated that "[t]he long-standing rule in the context of federal appointments is that '[i]n the absence of specific provision to the contrary, the power of removal from office is incident[al] to the power of appointment.'" (quoting *Keim v. United States*, 177 U.S. 290, 293 (1900)). In this case, the Third

Circuit determined Pennsylvania's Governor had the authority to remove officers from the Delaware River Port Authority of Pennsylvania and New Jersey ("DRPA") Board at will. The plaintiff argued that because the Compact, the creating legislation, placed term limits on the appointees, they could not be removed at the will of the Governor as under *Humphrey's Ex'r*. The court distinguished DRPA from the FTC analysis in *Humphrey's Ex'r* and the "character of office" analysis in *Morrison*, reasoning that the DRPA is a "politically sensitive body that must be responsive to the programs and policies of the administration presently in office." *Id.* at 735. In fact, the DRPA analysis explains the DRPA Board needs to consider policy and economic considerations when carrying out its duties of constructing and maintaining bridges and facilitating the transportation of passengers between Pennsylvania and New Jersey, which puts the agency under the control of the executive. *Id.* at 732. However, the Third Circuit reasoned, "[b]ecause the Compact does not limit the Governor's removal power, the Governor may exercise his power under the Pennsylvania Constitution to remove appointed officials to the DRPA Board." *Id.* at 738.

¶60 Similarly, the District Court for the District of Columbia recently determined that officers appointed to the Board of Visitors to the United States Naval Academy were also removable at the pleasure of the President, despite the term limits provided in the enabling statute. *Spicer v. Biden*, 2021 WL 5769458 at *5 (D.D.C. 2021). That court determined the *Humphrey's Ex'r* exemption did not apply as the role of the board "is to advise the president on the performance of a quintessentially executive function: the command and supervision of the Armed Forces," and reasoned that "absent a *specific provision* to the contrary" the President's removal power exists. *Id. Spicer v. Biden*, though determining the Board of Visitors is squarely under the arm of the

Executive branch, emphasizes that the executive's removal authority can be limited in specific provisions in enabling statutes.

### d. "For cause" removal as applied to Act No. 8472.

¶61    As stated *supra*, the ROA vests the authority of appointment and removal with the Governor; however, that right is limited by the clause which states, "except as otherwise provided in this or any other Act of Congress, or under the laws of the Virgin Islands." ROA § 11. The legislative power and the authority to create and amend laws is well-established, not only in the ROA, but under longstanding precedent in the Virgin Islands and the United States. *See Save Coral Bay, Inc. v. Bryan*, 2022 WL 960822 at *3 (V.I. 2022) (explaining the ROA vests the "legislative power and authority of the Virgin Islands in the Legislature" and that this power is "consistent with the well-established principle that the power to make the law is the quintessential legislative power."). Thus, the Court will look to the plain and ordinary meaning of the ROA to determine whether the Governor has an unrestricted power of removal. *See Willis v. People*, 71 V.I. 789, 796-97 (V.I. 2019).

¶62    A plain reading of Section 11 of the ROA grants the Governor the authority to appoint and remove "all officers and employees of the executive branch" except when determined otherwise by the Legislature. As applied to Act No. 8472, the Legislature has explicitly granted "for cause" protection to the non-governmental members. *See supra Arneson v. Wolf; Pievsky v. Ridge; Spicer v. Biden*. Thus, the analysis now turns to whether the "for cause" protection satisfies one of the exceptions granted in *Humphrey's Ex'r* or *Morrison*.

¶63    Under both exceptions carved out in *Humphrey's Ex'r* and *Morrison*, the Court must look at the characteristics of the agency to determine whether the removal restriction will impede the Governor's ability to exercise "general supervision and control" of the Executive branch as

36

delineated in the ROA § 11. The Court agrees with Plaintiffs that WAPA is not "quasi-judicial," nor "quasi-legislative," as established in *Humphrey's Ex'r*, however, the analysis does not stop there. Under *Morrison*, and upheld in *Seila Law*, the Court views the "ultimate question as whether a removal restriction is of 'such a nature that [it] impede[s] the [Governor]'s ability to perform his constitutional duties.'" *Seila Law*, at 2199. Plaintiffs maintain that if the Governor is "deprived of the power to remove 'those for whom he cannot continue to be responsible,' it would be impossible for him 'to take care that the laws be faithfully executed.'"[36] The Court disagrees.

¶64     Though WAPA is similar to the DRPA Board discussed in *Pievsky v. Ridge* in that it provides public services and has its board members appointed by the Governor, WAPA is distinguishable. DRPA is a public utility that builds and maintains infrastructure; however, DRPA's budgets are influenced by the political parties in power in both Delaware and New Jersey. *Pievsky v. Ridge*, at 736. That court reasoned that because the policy choices of the parties could drastically change the manner in which the commission was operated, such as by increasing the budgets for construction of bridges, the commissioners "must be accountable to the administration in office in order for DRPA to function properly." *Id.* Similarly, WAPA's impact on the public is broad-reaching and significant; and every decision will involve the people of the Virgin Islands in some way. However, WAPA is also distinguishable because the creation and function of WAPA was intended to be a "corporation having legal existence and personality separate and apart from the Government." Title 30 V.I.C. § 103. Therefore, any change to this structure cannot impermissibly impede on the Governor's ability to carry out his functions. Accordingly, the

---

[36] Plaintiffs' motion at 5.

Legislature's inclusion of a "for cause" removal provision does not violate the ROA nor run afoul of the separation of powers doctrine.

¶65    Importantly, and although not required, the Legislature placed the Director of Energy on the Board, granting the Governor direct input and some influence over the Board and its decisions. Thus, the Governor retains his authority to exercise some general supervision and control over WAPA. Nonetheless, because the Virgin Islands Legislature acted within their statutory authority Act No. 8472 is indeed valid.

### III.    The Government has not shown the likelihood of irreparable harm.

¶66    Now, turning to the remaining three factors of the four-prong test for injunctive relief, Plaintiffs argue the Governor will suffer irreparable harm if the restructuring of the Board is not enjoined because "the Board **could** make decisions that are contrary to the Governor's policies."[37] However, Plaintiffs claim here is speculative, at best. Even at the conclusion of the injunction hearing, there has been no indicia of evidence to suggest the restructured Board will act contrary to the Governor's goals or adverse to the public's best interest. Again, WAPA's unique status as a corporate body politic removes the day-to-day decisions of the Board from the Executive branch.

¶67    Plaintiffs argument for irreparable harm is similar to their argument that Act No. 8472 violates the separation of powers doctrine. Here, however, they focus on the Legislature, in determining which cabinet member is on the Board, and by protecting the non-governmental members with "for cause" removal protections, and how these acts impede the Governor's ability to exercise general supervision and control. They further argued at the hearing that the Legislature's intent on passing Act No. 8472 is for illegitimate reasons, arguing that the only

---

[37] Plaintiffs' motion at 11.

reason for the Act was to remove the Governor's influence from the Board is for political reasons. Both arguments fail to meet the standards of irreparable harm.

¶68    Irreparable harm is "certain and imminent harm for which a monetary award does not adequately compensate." *Yusuf v. Hamed*, 59 V.I. 841, 854 (V.I. 2013) (quoting *Wisdom Imp. Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 114 (2d Cir.2003). While there is no issue of monetary damages here, the Plaintiffs have not shown certain or imminent harm due to the restructuring of the Board. Act No. 8472 does not impermissibly impede the Governor's ability to control the Board in the way Plaintiffs suggest. Plaintiffs' argument fails to acknowledge that the Governor retains the authority to appoint all of the officers on WAPA's Board, may remove the Director of Energy at his will, and can initiate for cause removal proceedings against the non-governmental members if necessary. Considering the Legislature has broad authority in creating the laws of the Virgin Islands, inherent in that power is the Legislature's ability to create agencies in the structure they find appropriate and to establish removal protections they deem necessary. Accordingly, the Court is not persuaded the Government has met the burden of showing irreparable harm.

## IV.    Balance of harms.

¶69    At the hearing, the Government and WAPA both incorrectly argue that WAPA will be irreparably harmed if injunctive relief is not granted because the Board will not be able to meet regularly, as scheduled, with the new composition of the Board and the quorum requirement set at five members. WAPA adopts the Governments arguments that the restructuring of the Board will impact WAPA's operations and emphasizes that the day-to-day operation and control of WAPA is done through delegation by the Governing Board.

¶70     To support that argument, Mr. Hodge testified that the Board currently meets three times a month; both the Audit, Finance and Budget Committee and the Planning and Economic Development Committee[38] usually meeting once on the same day, and then one full meeting of the Board a week or two later. They used the August, September, and October 2021 meetings to illustrate how the restructuring of the Board will inhibit the Board's ability to function properly. Between the passage of Act No. 8472 and when preliminary injunctive relief was granted on October 5, 2021, the Board was only able to meet twice.[39] Mr. Hodge testified that often the non-governmental members of the Board are unable to attend the regularly scheduled meetings, so the three cabinet-level members are crucial to meet the quorum requirement. However, as previously explained, it can be inferred that Act No. 8472 changed the quorum requirement to four members, thus alleviating this concern.

¶71     WAPA also argues that since the Board will be affected in their ability to meet regularly, there will be unintended consequences such as investors questioning the stability of WAPA and WAPA's ability to continue functioning and could have implications on WAPA's access to the municipal bond market if investors see instability at WAPA as a result of the Act. These concerns have no bearing on the Legislature's ability to alter and amend laws inherent within their §8 authority. The Court recognizes challenges may arise during the transition period of coming into compliance with Act No. 8472, nevertheless, the reorganization must take place as the challenges have no bearing on the Legislature's authority.

¶72     Despite whatever potential negative impacts Act No. 8472 may have on the governing functions of the Board, it is the statutory powers and authority of the Legislature that prevail.

---

[38] *See* Plaintiffs' Ex 1, WAPA's Bylaws, Article XXIX, at 16.

[39] *See* Plaintiffs' Ex 4 and 5.

Plaintiffs have not shown the Legislature has acted beyond their statutory authority in the enactment of Act No. 8472, therefore the Court will not interfere with the Legislature's decision. Thus, it is incumbent upon the Executive branch that duly qualified and committed Board members are appointed. Accordingly, the Court finds there is no likelihood of irreparable harm to WAPA.

## V.    The public does not have a significant interest in enjoining the restructuring of the Board.

¶73    The Government argues that the public has an interest in enjoining the restructuring of the Board so that WAPA can continue to function, including passing the operating budgets. To support this, both parties point to the necessity of the Board to be able to meet regularly, particularly in hurricane season, to ensure WAPA can respond quickly to storms and other power interruptions and to keep projects on their scheduled timelines. As the only provider of water and power in the Virgin Islands, the public has a significant interest that a functioning utility provides uninterrupted electricity and provides clean water. The Court views this public concern as only tangentially related to the composition of the WAPA Board.

¶74    To further support their position, the Government relies on a statement by one Senator that the basis for Act No. 8472 was to rid the Board of "political cronies" and instead have "technical powerhouses" making the decisions at the Authority.[40] However, even if this was the sentiment of a Senator or the Legislature, the Act objectively sets criteria for non-governmental members to ensure that they have the particular expertise which both the Government and WAPA argue is necessary for the Authority to function. The public may even be indifferent as to the specific persons appointed to the Board as long as the Authority is able to provide uninterrupted, sustainable power and function at an optimal level which reduces, *inter alia*, both economic and

---

[40] Plaintiffs' Ex 3 at 3.

41

energy wastes. For these reasons, the Court finds the public's interest is not affected by the passage of Act No. 8472. Since Plaintiffs have not met any of the factors requiring injunctive relief, the Court will deny their request. Similarly, because the Plaintiffs have failed on the merits, the Court will also deny their request for declaratory judgment.

## CONCLUSION

¶75    For the reasons stated, Act No. 8472 does not violate the separation of powers doctrine and is a valid exercise of legislative authority. Accordingly, Plaintiffs' request for permanent injunction relief and declaratory judgment will be denied. An appropriate Order follows.

Dated: March 8 , 2023

**Renée Gumbs Carty**
Senior Sitting Judge, Superior Court
of the Virgin Islands

ATTEST:
Tamara Charles
Clerk of the Court

By:
Donna D. Donovan
Court Clerk Supervisor 3 / 9 / 2023

**IN THE SUPERIOR COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. THOMAS AND ST. JOHN**
**\*\*\*\*\*\*\*\*\*\***

GOVERNOR ALBERT BRYAN,　　　　　　)
in his official capacity, and the　　　　　　)　　CASE NO. ST-21-CV-361
GOVERNMENT OF THE VIRGIN ISLANDS　)
　　　　　　　　Plaintiffs,　　　)　　ACTION FOR DECLARATORY
　　　　　vs.　　　　　　　　)　　JUDGMENT AND INJUNCTIVE
　　　　　　　　　　　　　　)　　RELIEF
VIRGIN ISLANDS WATER AND POWER　　)
AUTHORITY,　　　　　　　　　　)　　Cite as 2023 VI Super 5
　　　　　　　Defendant.　　　)
　　　　　　　　　　　　　　)

## ORDER

The Court having issued a Memorandum Opinion on this date, it is hereby

**ORDERED** that Plaintiffs' motion for permanent injunctive relief and declaratory judgment

is **DENIED**; and it is further

**ORDERED** that the Temporary Restraining Order entered on September 20, 2021,

maintaining the Governing Board status pre-enactment of Act No. 8472 is **LIFTED**; and it is further

**ORDERED** that copies of this Order shall be distributed to Assistant Attorneys General Ariel

M. Smith, Esquire and Julie A. Beberman, Esquire; Dionne G. Sinclair, Esquire, and Aysha R.

Gregory, Esquire.

Dated: March 8, 2023

**Renée Gumbs Carty**
Senior Sitting Judge, Superior Court
of the Virgin Islands

**ATTEST:**
Tamara Charles
Clerk of the Court

By
Donna D. Donovan
Court Clerk Supervisor　3 / 9 / 2023